16-1023 New England Power Generators Association, Inc. petitioner v. Federal Energy Regulatory Commission, Mr. Tice for the petitioner, Ms. Bonta for the respondent. Mr. Tice, on behalf of Petitioner NEPCA, this January, FERC issued an order finally acknowledging what petitioner and intervenors have been arguing since 2014, that the same unintentional interaction between two market mechanisms that's challenged in this lawsuit is unjust and unreasonable within the meaning of the Federal Power Act. Given that NEPCA's argument is based on a mathematical inevitability, and as FERC now recognizes, has been borne out by subsequent events, this Court should hold that FERC erred in failing to find that interaction unjust and unreasonable when it was initially challenged. In fact, FERC twice erred below in failing to satisfy its statutory duty. The 20-months additional data provided as the basis for that January 2017 ruling. That is true, Your Honor. It was based on 20 months of additional harm to suppliers, but that was the principal difference in the evidence between the two proceedings. In the initial one, the suppliers came forward with evidence of historical data, an economist affidavit explaining what would likely happen. And to be clear, the historical data was based on an analysis conducted by the independent system operator. It was not a made-for-litigation analysis of what the likely effect of increasing these adders would be on the rebate. And then, in addition to that, there was evidence of actual harm that was submitted to FERC the day after the complaint was filed. So on December 3rd, 2014, the day the complaint was filed, that was the same day that these adders went into effect and were going to have this effect on the rebate. The very next day, December 4th, there was an event in Quebec, a power shortage that jacked up the real-time energy prices and, at the same time, also jacked up the peak energy rebate, just as predicted. We put that evidence before the Commission. The Commission, at first, in denying our complaint, failed to recognize that we didn't put that information before it. And then, later on in the hearing, said, well, we did put in some evidence of harm, but we didn't submit another example of that harm. And we think that, given the record before the Commission at that time, all of the evidence that was submitted was submitted on our side. It all pointed to the fact that this was not just and reasonable at that time. And you can take a look at FERC's order, its actual analysis, when it denied our complaint. It's on JA 558 through 561. It's fairly brief. It doesn't cite any particular evidence. What it says is, you know, you've put forward some evidence of future prediction based on this historical analysis. You've also suggested that, you know, you have this economist's report, but it's possible that prices could converge. Or it's possible that, if you take a look at all of the revenues you receive, that, you know, maybe this is not unjust and unreasonable because maybe you're making some money elsewhere. What you don't see, though, is you don't see FERC saying, we intended this rebate, this effect on the rebate to happen. Or you don't see FERC actually citing any data or analysis of its own based on that evidence that was submitted. And I think on a number of occasions, this Court has actually reversed or vacated a FERC order and remanded in situations where it found that FERC analysis did not engage in reasoned decision making. And it does so, including in cases where FERC has failed to cite the evidence that it relied on. And I think when you have, for example, in the Trans-Canada case, I think it's, this Court said that in the cite FERC versus Independence Power Partners case from 1999 that's cited in FERC's brief that makes the point that FERC failed to cite any of the data and analysis it relied on. And we think that in that circumstance where all of the evidence was on one side, and very importantly, too, Your Honors, I think that the fact that this is not just an evidentiary proposition, it was also, as we pointed out, a mathematical inevitability that was not really even disputed by FERC at the time or even now in its briefs. And by mathematical inevitability, we simply mean that the rebate that imposed this sort of penalty charge on suppliers is calculated using only two variables. It's the real-time energy price and a strike price. And whenever the real-time price exceeds the strike price, the rebate also increases. So what FERC did is it increased dramatically the real-time prices through the addition of these adders. And it was going to have this inevitable mathematical effect that no one really disputed. Now, again, FERC's explanation was, well, if you take a look at all of the revenues you make, maybe because, you know, we've imposed a price floor a few years earlier, maybe you're getting enough. Or maybe because, you know, day-ahead energy market revenues might increase, well... We have in the record more than one proceeding before FERC. That's right. We have the original tariff period, and then we have the complaint proceedings. That's right, Your Honor. The issue that you're now arguing, is it... Which of the cases we're reviewing is it actually in? This is the second proceeding, the complaint and complaint rehearing. But I'm glad you brought that up, Your Honor, because it's important to look at the context. Can we look back at that as far back as the original tariff proceeding, or should we be looking just at the record in the complaint proceedings? I think you can look at both, Your Honor. The government has raised a jurisdictional argument. That's what I'm getting at. Of course. The government raised a jurisdictional argument based on the fact that NEPCA itself did not raise these arguments on rehearing of the tariff proceeding. But I think there's a couple of reasons why that should not pose a jurisdictional problem here. The first one is, as we pointed out in our briefs, the members of NEPCA who raised... There were several members of NEPCA who did, in fact, raise this issue on rehearing of the original tariff order. They made these exact arguments. Are they parties here? One of them is an intervener here, Your Honor. So I think that should obviate any jurisdictional concerns. NEPCA is both representing their interests, and Dynagy, which is the relevant party who raised on rehearing, is also now an intervener before this Court, pressing the exact same arguments. Aside from the question whether somebody else raised these arguments, what do you do with the language in subsection A of the jurisdictional statement or statute that says, no proceeding to review any order of the Commission shall be brought by any entity unless such entity shall have made application to the Commission for rehearing thereof? You never filed a rehearing petition. You filed a clarification request on another subject. That's correct, in part, Your Honor. NEPCA itself did not file a petition for rehearing. It did file a motion for clarification, and FERC often treats those as motions for rehearing in appropriate circumstances. But I think the more important point, again, is that NEPCA, several NEPCA members did, in fact, raise it. NEPCA is now here petitioning... So there's no entity. You're an entity. You're representing an entity. You may be an entity yourself. That's right, Your Honor. But I think in the circumstances of this case where you have essentially a party that has sort of akin to the way that in Article III standing context, you look at the injuries of the members when you discern whether an association is standing. This is statutory jurisdiction, not Article III. I understand, Your Honor. But I mean, I think it would be an odd rule, for example, if one company were to purchase a second company, and then nobody, you know, the first company had been the one that brought the challenge. And then because it was now a different entity, no one could bring the challenge. I understand that it says entity, but I think it has to be interpreted or ought to be interpreted in a more flexible manner where you have essentially a party representing the interests of that entity before the commission. And again, particularly in this circumstance where the intervener, where one of the entities that raised this exact challenge is before this court, it seems that at a minimum, given the statutory language regarding reasonable grounds for a party failing to raise it at the time, that should suffice to obviate any jurisdictional concerns. Is there any case where we've recognized anything analogous to that as being reasonable grounds? We have not, Your Honor. Specifically, we cited two cases in our brief. Both of them just involve sort of unusual circumstances. Neither of them had anything to do with this situation, though, right? They did not. But also we've looked, we haven't found any situation foreclosing this sort of relief where a party is essentially being represented by the entity that brought it. If we do not have jurisdiction over the tariff proceeding, is this issue in the complaint proceeding? This issue is, Your Honor. We've made the other point that's inextricably intertwined with them. And I think really the overall point is that given what happened in the complaint proceeding where FERC had a duty to determine that these rates were just and reasonable and failed to do so, it simply said that's outside the scope of this proceeding, go ahead, you know, bring a complaint proceeding, do something else. You say they had a duty. You're talking about the duty which you describe as the duty to examine the entire economic realm involved, not just the particular rate before it. I don't think, I don't, I wouldn't characterize the argument that way, Your Honor. Our issue was brought before by the group of generators, brought directly to the attention, and it had this direct and inevitable impact on the rebate. This is not a situation where you tweak one dial and something, you know, totally unrelated happens down the road. It's not a, you know, butterfly flaps its wings sort of situation. This is, the rebate, as I said, only has two variables. One of them is the real-time price. And what FERC did was create this problem by raising the real-time prices dramatically and then said, well, we don't actually have to look. Now in the complaint proceeding, you had the burden of proof, right? We did. But we had the burden of proof because FERC, you know, I think it's important to recognize the context, which is that if FERC had under 206 wanted to determine that the current rates were unjust and unreasonable, it then had the burden to determine the new just and reasonable rate by sort of punting on that issue and saying, bring it up in a complaint proceeding rather than either. I mean, it has discretion to structure its own proceedings, but it could have, for example, set for hearing this specific issue with only the parties involved. It could have also have required the system operator to file a compliance filing suggesting whether or not the peak energy rebate should be adjusted based on the complaints of these parties. It didn't either. It simply said, punt and you bring a separate complaint where you'll bear the burden of proof. And we think that's... Okay. Thank you very much. We'll give you a couple minutes, Matt. Good morning. Good morning. I'm Carol Banter for the commission. Just to begin with that last point about the tariff orders. As we, as your honors noted, the section 313, what this court has strictly construed. There are many cases, I'm sure we cited some in our brief about how the case strictly construes the language of 313. I would also add to that, as we noted in our brief, particularly page 30, footnote three, the issues that the petitioners now press with regards to the tariff order, this supposed failure to meet the commission's own burden, in addition to the full rate impact argument they had made. No party, not their members, not anyone else, no one raised that in the tariff proceeding, saying you're failing to step two of the 206. So any way around it, that just was not raised and cannot be considered in the tariff proceeding. With regard to the complaint proceeding, first of all, the commission has never agreed that this was a mathematical inevitability. That was actually much of the gist of the commission's analysis of petitioner's evidence in the complaint proceeding, saying you came in with just a straight mathematical equation and said that's all you needed to do. You didn't put it in context. You didn't show the, I'll talk about the backward data, but the convergence issue in particular. You didn't address the impact that we expect these increased reserve constraint penalty factors to have on market dynamics that could affect your energy revenue in the day ahead market. Now petitioners have said that the commission didn't cite anything for that when it mentioned it in, when it discussed it in paragraphs 38 and 39 of the complaint order, that's at 559.60. I would just point out in the first sentence of paragraph 39, the commission directly references NESCO's protest, that's the intervener states committee. That goes to pages 474 and 475 of the joint appendix. That's record evidence that NESCO had put in about the expectation of, I think convergence isn't necessarily always the word used, but that the effect in the real time prices would be expected to have an effect in the day ahead market. The ISO had actually noted that in its so-called back cast that it had done, that's at day 437 and 439. It actually goes back to the very reason that the increased penalty factors, penalty factors is not a great word, it's their price caps. The increase in the tariff proceeding had been proposed by the power pool actually at the instigation of NRG Energy, which is a member of NEPCA actually. And the power pool had proposed this as an alternative to the pay for performance. That's in, that's discussed in paragraph 101 of the tariff order, 250 and 251. It references the power pool transmittal, which in turn references testimony put in by an expert from NRG that explained one of the four justifications for raising these price caps was number three, better encourage market participants to schedule in the day ahead market and pursue other hedging activities to limit and manage their exposure to real time prices. And their expert, Mr. Fuller, discussed it in terms of smoothing out both revenues and costs to encourage predictability. The gist of this is that there was record evidence, not only in the proceeding that raised these price caps to begin with, but in the complaint proceeding itself. The commission was not just in economic theory that this might happen. There were a number of parties, including generators in New England, that fully expected it to happen and actually proposed this measure in part to make that happen. So the commission said, you come in with your complaint, you just did math against math and said that was the end of it. You didn't even try to account for projections about what might happen under the new, you know, how this convergence might play out. With regard to the second complaint that was brought in 2016 that the commission granted in part this January, obviously it's not before the court in this case, but I'm prepared to discuss it a little bit. Also, no one ever sought rehearing and it settled. So that case doesn't, that order doesn't quite have the kind of precedential value that, you know, an order that had been fully thought, not thought out, but fully challenged and reconsidered on rehearing might. But in that case, their same, NEPCA's same expert that they used the first time, came back with very different testimony where he really, in my view, addressed the shortcomings that the commission had focused on in the orders under review. He did try to account for convergence, whether it had to happen or not of how many PER events had happened. He addressed that the commission had expected that those would be more likely in peak times, hot weather, cold weather. And in his testimony, he specifically talked about how many PER events had actually happened on weekends and shoulder seasons and not in those expected times. So in the second complaint, they made a very different case than they did in the first complaint where the commission said, you didn't show us what this math proves. You didn't show us what the backward facing evidence suggested. You didn't say, is this a typical year? Are these PER events happening at typical times? None of that analysis was there in these complaint orders. How do they make a showing of what you call PER, it's peak? I'm sorry, peak energy rent adjustment. There are too many acronyms, I know. How do you make a prediction about that? On what basis can you make a prediction about how many of those events will occur in any given year in the future? Well, I think what the commission said, the commission didn't reject the idea that the backward looking single year, I mean, it was only a single year of data. The commission didn't say out of hand, that's not enough. It said, you haven't even tried to explain, was this a typical year? Did these events happen at typical times? None of that was there. And in fact, when the commission's looking at this case in January of 2015, and then on re-hearing, the commission pointed out in the re-hearing order that when re-hearing was filed in March 2015, they didn't say anything about, had there been anything except December 4th, in that period from December through February, that's a third of the capacity year. For that matter, even though it predates the increased price caps, we weren't told anything about what had happened in the first half of the capacity year from June 2014, before the Quebec thing happened. The Quebec thing was the only thing that was, there was evidence about. That was a failure of a generator? It's actually a funny story. It's an odd story. It's a kind of freak event. I just did a little outside research on it. Apparently, some guy dropped small objects from a plane onto two extra high voltage transmission lines and took out a whole bunch of hydro from Quebec. So it wasn't a heat wave or a weather event. It really was a freak thing. I don't know if they even knew that when the filings were being, that was a Canadian investigation that came later. But there had been peak energy rent adjustment triggering events in the capacity year four that the ISO had analyzed. But there was no evidence put into the record about whether those 10 peak energy rent adjustment hours were typical or anomalous. Were they bunched together? Just explain what this data means. It may still not be enough. Maybe it will. The commission doesn't know because it wasn't given a useful context to understand the predictive value of the backward looking data. Unless the court has further questions. Thank you. Thank you, Your Honor. Three quick points. First of all, my friend on the other side mentioned that no party raised this issue in the complaint, the rehearing. I don't think that's accurate. JA-278, the generators very clearly said that this unfairly increases already unjust and reasonable penalties paid by resources. I think it was adequately preserved at that time. And in fact, the commission said, we acknowledge this inefficiency, but essentially, we'll deal with it in some other proceeding. We're not going to deal with it now. Number two, my friend mentioned that this was not a mathematical inevitability. I think that's inconsistent with what the commission actually held below. I think what the commission found was that there were, in specific language, the FERC actually found that on page JA-560, they said generators have put forward evidence showing that they may have to significant PER adjustments to load. In other words, they put forward evidence that we're going to have to pay these large rebates. They just didn't put forward, in their view, enough evidence of how typical it was, how often it was, that sort of thing. In the concurrence, the same thing, that two of the concurring commissioners found that we raised serious concerns. We think in that circumstance, Your Honor, at a minimum, what the commission should have done is set it for hearing. If they thought that we had made a showing that this happens, and when it happens, it's essentially a market malfunction. This is not, again, you did not hear FERC say, and you cannot find anything below, where FERC said it meant this to happen. It meant these large transfers of revenue that were totally accidental. I think in that circumstance, when we've raised these valid concerns, FERC should have set the matter for hearing. In fact, we specifically asked for a hearing at JA-565, and Rule 206G of FERC's rules provides that, on a complaint, it can either set a matter for settlement proceedings, or it can set it for hearing, in addition to what it actually did, which was resolve on the pleadings itself. So I think at a minimum, where all these serious questions were raised about an essential market malfunction, there was a broken rule that FERC did not intend for this massive rebate spike to happen. I think in that circumstance, at the very least, it should have used its expertise to gather more evidence, rather than say, come back in 20 months after you've lost millions and millions of dollars. And I think if you look at the evidence of what actually ended up happening, there was $193 million of peak energy rebates paid in that 20-month period, and FERC should have, at that time, or prior to that time, realized that this was unjust and unreasonable rule. Thank you. Thank you. The case is submitted.
judges: Griffith, Sentelle, Randolph